IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39753-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRYAN WAYNE HULSIZER, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, J.P.T.[1] — Bryan Hulsizer appeals his conviction for vehicular assault,

along with two legal financial obligations (LFOs) imposed at sentencing. We affirm

Mr. Hulsizer's conviction and one LFO, but remand to strike the other pursuant to recent

statutory changes.

---

[1] Kevin M. Korsmo, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

FACTS

In the mid-afternoon of August 7, 2022, Bryan Hulsizer was driving eastbound on Upriver Drive in Spokane County. He was in a Porsche sport-utility-vehicle (SUV) and pulling a trailer with a car. Ex. 1. Upriver Drive is a two-lane road with a posted speed limit of 30 miles per hour. There were a number of vehicles traveling on Upriver Drive that afternoon and traffic was slow, causing several lineups of cars.

As Mr. Hulsizer's line of vehicles neared Boulder Beach, two eastbound motorcycles caught up to them. The motorcycles were going faster than traffic and were "skipping" over the center line to pass lines of slower moving cars. 1 Rep. of Proc. (RP) (Feb. 15, 2023) at 470. One of the drivers in the line of cars was operating a dashboard camera (dashcam). The sounds of the motorcycles revving their engines can be heard on the dashcam's audio.

As the lineup of cars approached Center Road, the motorcycles accelerated and crossed over a double yellow line in an attempt to pass. At this point, the motorcycles were traveling anywhere between 40 and 60 miles per hour. Mr. Hulsizer's SUV and trailer were three cars ahead of the motorcycles when they began to pass.

Joseph Hudson was operating the lead motorcycle. As Mr. Hudson neared Mr. Hulsizer's SUV and trailer, Mr. Hulsizer swerved into the westbound lane of travel.

2

The dashcam video shows Mr. Hulsizer moved almost entirely into the westbound lane before quickly returning to the eastbound lane. The driver of the car with the dashcam described the maneuver as "aggressive." *Id*. One witness indicated Mr. Hulsizer's vehicle bumped into Mr. Hudson's motorcycle. However, law enforcement found no evidence of physical contact.

The sudden lane change left Mr. Hudson without sufficient space to continue forward in his line of travel. Mr. Hudson slammed on his brakes, steered away from Mr. Hulsizer's vehicle, and lost control of the motorcycle. Mr. Hudson and his motorcycle veered off the roadway, hit a patch of rocks, and flew 30 to 35 feet into the air. Mr. Hudson landed on his back and lost consciousness. He later woke up in the hospital, having sustained numerous serious injuries, any of which could have proven fatal.

Several motorists stopped in response to the crash. Some ran to help Mr. Hudson. The driver of the car with the dashcam approached Mr. Hulsizer and asked why he had swerved his vehicle into the oncoming lane. Mr. Hulsizer responded by commenting, "that will teach him for making a move like that." *Id*. at 475.

Law enforcement interviewed Mr. Hulsizer at his home several hours after the crash. Mr. Hulsizer stated he did not see the motorcycles until they came flying by him at

80 miles per hour. Mr. Hulsizer denied moving his SUV into the opposing lane of traffic. He stated he had adjusted his vehicle in response to a car coming down from a driveway. He denied going into the middle of the road.

Ten days later, law enforcement again contacted Mr. Hulsizer. At this point, they had reviewed the dashcam footage. Mr. Hulsizer repeated he did not know the motorcycles were there until they passed him. He was instead focused on a truck in front of him and what he believed was a driver coming out of a driveway. Officers confronted Mr. Hulsizer with the fact that the video did not show an oncoming car. Mr. Hulsizer then conceded he did not see a car coming down, but he continued to state that he was focused on the truck. Mr. Hulsizer denied swerving into the opposing lane of traffic. Mr. Hulsizer was placed under arrest.

The State charged Mr. Hulsizer with one count of felony vehicular assault, with an aggravating circumstance based on the victim's level of injury. Through an amended information, the State added two misdemeanor charges: violation of an ignition interlock requirement and third degree driving while license suspended. Mr. Hulsizer pleaded guilty to the two misdemeanors and proceeded to trial on the felony.

At trial, the State presented evidence consistent with the above summary. Mr. Hulsizer theorized that his conduct was not the proximate cause of Mr. Hudson's

injuries. Mr. Hulsizer presented expert testimony from a traffic collision reconstructionist.

The expert estimated Mr. Hudson's average speed was 59.2 miles per hour during the

attempt to pass Mr. Hulsizer's line of cars. According to the expert, Mr. Hudson's

decision to pass the line of cars was a "risky activity" that required "hypervigilan[ce]."

2 RP (Feb. 21, 2023) at 819. Having examined the crash site, the expert did not find

evidence that Mr. Hudson had applied his brakes. The expert opined that Mr. Hudson

could have avoided crashing had he properly engaged his brakes.

The trial court instructed the jury that the State needed to prove Mr. Hulsizer's

"vehicle operation or driving proximately caused substantial bodily harm to another

person." Clerk's Papers at 110. The court also issued two instructions addressing

proximate cause:

> Instruction No. 11
> To constitute vehicular assault, there must be a causal connection between the substantial bodily harm to a person and the driving of a defendant so that the act done was a proximate cause of the resulting substantial bodily harm.
> The term "proximate cause" means a cause which, in a direct sequence, unbroken by any new independent cause, produces the substantial bodily harm, and without which the substantial bodily harm would not have happened.
> There may be more than one proximate cause of substantial bodily harm.

*Id.* at 113.

Instruction No. 12

If you are satisfied beyond a reasonable doubt that the act or driving of the defendant was a proximate cause of substantial bodily harm to another, it is not a defense that the driving of another may have also been a proximate cause of the substantial bodily harm.

However, if a proximate cause of substantial bodily harm was a new independent intervening act of the injured person or another which the defendant, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen, the defendant's act is superseded by the intervening cause and is not a proximate cause of the substantial bodily harm. An intervening cause is an action that actively operates to produce harm to another after the defendant's act has been committed or begun.

However, if in the exercise of ordinary care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original act and the defendant's act is a proximate cause. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the substantial bodily harm fall within the general field of danger which the defendant should have reasonably anticipated.

*Id*. at 114.

The defense argued that Mr. Hulsizer did not intentionally swerve into the other lane and was not the proximate cause of Mr. Hudson's injuries. Nonetheless, the jury convicted Mr. Hulsizer of vehicular assault and returned a special verdict, finding the State had proven the aggravating circumstance.

At sentencing, the court calculated Mr. Hulsizer's standard sentencing range as 6 to 12 months. The court imposed an exceptional sentence of 13 months based on the jury's finding of the aggravating circumstance. The court determined Mr. Hulsizer

6

was not indigent and imposed $800 in LFOs, including a $500 crime victim penalty

assessment (VPA), $200 criminal filing fee, and $100 DNA collection fee. After

Mr. Hulsizer filed his notice of appeal, the court entered an order of indigency and

appointed counsel at public expense.

ANALYSIS

*Whether the State proved Mr. Hulsizer's conduct was the proximate cause
of the victim's injuries.*

Mr. Hulsizer contends the State did not produce sufficient evidence of proximate

cause to justify his vehicular assault conviction. A claim of insufficient evidence demands

a very deferential standard of review. We must construe the "evidence in the light most

favorable to the State" and ask whether "any rational trier of fact could have found guilt

beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Washington's vehicular assault statute requires the State to prove a defendant's

criminal misconduct was a proximate cause of the victim's injuries. RCW 46.61.522;

*State v. Roggenkamp*, 115 Wn. App. 927, 943-47, 64 P.3d 92 (2003), *aff'd*, 153 Wn.2d

614, 106 P.3d 196 (2005). "Proximate cause is a cause which in direct sequence,

unbroken by any new, independent cause, produces the event complained of and without

which the injury would not have happened." *State v. Gantt*, 38 Wn. App. 357, 359, 684

P.2d 1385 (1984). There can be more than one proximate cause for any particular event

7

or injury. *State v. Meekins*, 125 Wn. App. 390, 398-99, 105 P.3d 420 (2005). Thus,

a victim's contributory negligence does not negate proximate cause. *State v. Judge*,

100 Wn.2d 706, 718, 675 P.2d 219 (1984). In order for an independent cause (also known

as a superseding cause) to break the chain of proximate cause, it must be something that

(1) occurred after the original cause and (2) was not reasonably foreseeable. *Roggenkamp*,

115 Wn. App. at 945. Factors relevant to foreseeability include whether: "(1) the

intervening act created a different type of harm, (2) the intervening act constituted

an extraordinary act, and (3) the intervening act operated independently." *Id*.

The State's evidence of proximate causation was more than sufficient to justify

the jury's verdict. The wrongful conduct giving rise to Mr. Hulsizer's vehicular assault

charge was the aggressive lane change. At the time of this misconduct, Mr. Hudson

was also engaged in misconduct—he was speeding and he had illegally changed lanes.

Nevertheless, Mr. Hudson's actions did not break the chain of proximate causation

because they occurred before and during Mr. Hulsizer's misconduct. A rational fact

finder could therefore conclude that Mr. Hulsizer was not entitled to escape liability

based on Mr. Hudson's misconduct.

Mr. Hulsizer's arguments against proximate cause are difficult to decipher, but it

could be he is trying to argue there was a break in the causal chain because Mr. Hudson

engaged in a new type of misconduct after Mr. Hulsizer's lane change. At trial,

Mr. Hulsizer's expert testified that Mr. Hudson's failure to properly apply his breaks

was a superseding event that occurred after Mr. Hulsizer's conduct. There are two flaws

with this argument. First, Mr. Hudson testified he did apply his brakes and our standard

of review requires construing the evidence in the light most favorable to the State. But

in addition, even if we were to accept the expert's claim that Mr. Hudson engaged in

new misconduct, Mr. Hulsizer's argument would fail the foreseeability test. To the extent

Mr. Hudson responded to Mr. Hulsizer's lane change by mishandling his motorcycle,

this was a foreseeable consequence of Mr. Hulsizer's conduct. While Mr. Hulsizer might

have hoped that an expert motorcyclist would have successfully dodged his vehicle and

avoided injury, a contrary result was entirely foreseeable. After the crash, Mr. Hulsizer

admitted to another motorist that he swerved into the opposing lane of traffic in order

to teach Mr. Hudson a lesson. This comment reflects Mr. Hulsizer's awareness that his

conduct created an increased risk of harm.

Viewed in the light most favorable to the State, the trial evidence showed that any

misconduct by Mr. Hudson either occurred before Mr. Hulsizer's lane change or was a

reasonably foreseeable reaction to the lane change. In either scenario, the State met its

burden of proving proximate cause. Sufficient evidence supports the jury's verdict.

9

*LFOs*

Mr. Hulsizer contends two LFOs imposed at sentencing—a VPA and DNA collection fee—must be stricken due to recent legislative changes.[2] The State argues Mr. Hulsizer is not currently entitled to relief.

Under the law in effect at the time of Mr. Hulsizer's sentencing, the trial court was required to impose a $500 VPA and $100 DNA collection fee. *See* Former RCW 7.68.035(1)(a) (2018); former RCW 43.43.7541 (2018). But effective July 1, 2023, the legislature amended both statutes. As the law now stands, the VPA cannot be imposed on a defendant found to be indigent at the time of sentencing. *See* RCW 7.68.035(4). The DNA collection fee is no longer applicable to any criminal defendant. *See* Laws of 2023, ch. 449, § 4. Although these changes postdate Mr. Hulsizer's sentencing hearing, they apply prospectively to his case because it is pending direct review. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) (citing *State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)).

The State acknowledges the applicability of recent legislative changes, but nevertheless claims Mr. Hulsizer is not entitled to VPA relief because he was found not indigent at the time of sentencing. *See* RCW 7.68.035(4) ("The court shall not impose

---

[2] Mr. Hulsizer does not challenge imposition of the $200 criminal filing fee.

the [VPA] if the court finds the defendant, *at the time of sentencing*, is indigent as defined in RCW 10.01.160(3).") (emphasis added). We agree. Mr. Hulsizer was not indigent at time of sentencing.[3] The trial court did not err in imposing the VPA.

With respect to the DNA collection fee, the State argues Mr. Hulsizer has not shown he is entitled to effective relief because he may have already paid the DNA fee. According to the 2023 amendments, the court is not required "to refund or reimburse amounts previously paid toward[] [LFOs], interest[] on [LFOs], or any other costs." LAWS OF 2023, ch. 449, § 22. The State's arguments regarding the applicability of DNA relief go to the question of whether Mr. Hulsizer receives any benefit from the change in law rather than its applicability to his case. Because this case was active on appeal at the time of the change in law, the DNA fee should be stricken.

CONCLUSION

The judgment of conviction is affirmed. We direct the trial court to strike the DNA collection fee from the judgment and sentence.

---

[3] Mr. Hulsizer was represented by retained counsel in the trial court. At the time of the offense conduct, he was driving a Porsche valued in excess of $100,000 and towing another vehicle that he had been displaying at a car show. No order of indigency was ever sought at the trial court level until after Mr. Hulsizer appealed. The trial judge had a sufficient record during sentencing to enter a finding of nonindigency.

11

No. 39753-0-III
*State v. Hulsizer*


A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Korsmo, J.P.T.

WE CONCUR:

_____
Staab, A.C.J.

_____
Fearing, J.